SUPREME COURT.    At Chambers.    Before Justice *Edmonds* City of New York, February 25, 1851.

## THE PEOPLE vs. RAY TOMPKINS.

Where, on a return to a writ of habeas corpus, it appears that the prisoner was detained by virtue of a warrant issued by a police justice, upon complaint on oath, the officer, before whom the habeas corpus is pending, has a right to go behind the warrant and inquire into the legality of the imprisonment.

To constitute the crime of obtaining property by false pretences under the statute, two things are essential, viz., a false representation as to an existing fact and a reliance upon that representation as true.

Where, from the depositions taken before the police justice, it appeared that N, agreed to sell to T one hundred shares of stock, deliverable and payable the next day, and on the next day, before transferring the stock, N sent for T's check and received for answer that T had sent his check to be certified and would send it to N in ten or fifteen minutes, and relying upon this statement N thereupon transferred the stock to T, *held*, that it was apparent that N's reliance was on the promise and not on the representation that the check had been sent to be certified, and that a case was not shown within the statute, especially as there was no proof showing that the check had not been sent to be certified, and the prisoner was discharged.

Forms of writs of habeas corpus and certiorari, of the allowance thereof and of the return thereto.

The People *v*. Tompkins.

On the 25th day of February, 1851, an application was made in due form of law by Ray Tompkins, to Mr. Justice Edmonds, for a writ of habeas corpus to be directed to Isaac Edwards, a police officer of the city of New York, then having the said Ray Tompkins, as was alleged, in custody; which writ was as follows:

The people of the state of New York, to Isaac Edwards, greeting:   We command you that you have the body of Ray Tompkins, by you imprisoned and detained, as it is said, together with the time and cause of such imprisonment and detention, by whatsoever name he shall be called or charged, before the Hon. John W. Edmonds, at the chambers of the said judge, No. 5 Brevoort Place, in the city of New York, on the 25th day of February instant, at 7 o'clock, P. M., to do and receive what shall then and there be considered concerning him, and have you then and there this writ. Witness, John W. Edmonds, esquire, one of the justices of the supreme court, on the 25th day of February one thousand eight hundred and fifty-one.

G. W. RIBLETT, Clerk.

JONAS B. PHILLIPS, Attorney.

Allowed February 25, 1851.

J. W. EDMONDS.

Under which writ, the said Tompkins was brought before the said justice, and the return being suspended till the 27th of February, 1851, he was remanded and continued in the custody of officer Edwards aforesaid. To the said writ return was duly made by the said Isaac Edwards in the words and figures following, to wit:

I, Isaac Edwards, one of the policemen of the city of New York, upon whom the annexed writ of habeas corpus was served, hereby return to said writ: That I hold and detain the said Ray Tompkins therein named, in my custody. That I do hold and detain him under and by virtue of a warrant, a copy whereof is hereto annexed, and the original whereof I now pro

duce. And I further return that the said writ of habeas corpus was served upon me in the police office, Halls of Justice, in this city, after I had written my return upon the said original war rant, but before I had actually returned the same.

February 27th, 1851.

ISAAC EDWARDS.

*State of New York, city and county of New York:*

To any constable or policeman of the city of New York:

Whereas, complaint on oath has been made before the un dersigned, cne of the police justices for preserving the peace in the said city, by Benjamin Nathan: That at the city of New York, on the 29th day of January, 1851, *Ray Tompkins* did designedly, and by means of *false pretences*, cheat and defraud the said Nathan out of one hundred shares of the stock of The Farmers' Loan and Trust Company, of the value of three thousand dollars and more, the property of the said Nathan. These are, therefore, in the name of the people of the state of New York, to command you, the said constables and policemen, and every of you, to apprehend the body of the said defendant, and forthwith bring him before me, or some other justice of the peace, for the city and county of New York, at the police office, Halls of Justice, Centre street, in the said city, to answer the said charge, and to be dealt with as the law directs. Given under my hand and seal, this 21st day of February, 1851.

J. LOTHROP, Police Justice.

And the prisoner made answer to the said return in the words and figures following:

In the matter of RAY TOMPKINS—Before the Hon. John W. Edmonds, on return of habeas corpus.

The answer of Ray Tompkins to the return made by the officer to the writ of habeas corpus, shows that this defendant denies that the magistrate had any authority whatsoever to issue a warrant for the arrest of him, the said defendant; that there was no complaint or testimony before said magistrate, showing

The People *v.* Tompkins.

that this defendant had been guilty of any criminal offence, or that any criminal offence whatsoever had been committed, to authorize or justify the issuing of said warrant. And this defendant further answering, avers that no return had been made by the officer to said warrant at the time the writ of habeas corpus was served upon said officer in whose custody defendant was at the time of the service of said writ. That the officer, it is true, had endorsed a return upon said warrant; but the same having never been returned, he (the said officer) erased such endorsement by drawing ink lines across and through the writing thereof, as he is informed and believes.

RAY TOMPKINS.

*City and county of New York, ss:*

Ray Tompkins being duly sworn, says that he has read the foregoing answer by him subscribed, and knows the contents thereof, and that the same is true of his own knowledge, except as to the matters therein stated to be upon his information and belief, and as to these matters he believes it to be true.

RAY TOMPKINS.

Sworn to before me, Feb. 27th, 1851.

J. W. EDMONDS.

Judgment being again suspended on the said writ until March 3d, A. D. 1851, on that day the prisoner was again brought up, and again remanded until the 7th day of March, A. D. 1851, and again on that day remanded until March 14th, 1851, A. D. when final hearing was had. On the 26th day of February, a writ of certiorari on the application of the said Ray Tompkins was also allowed by his Honor Judge Mitchell, as will fully appear by the said writ and endorsement thereto as follows:

The people of the state of New York, to Jeremiah Lothrop, justice police court, and Isaac Edwards, policeman, greeting:

We command you, that you certify fully and at large to the justices of the supreme court, at the City Hall, on the 27th of February, A. D. 1851, the day and cause of the imprisonment

The People *v.* Tompkins.

of Ray Tompkins, by you detained as is said, by whatsoever name the said Ray Tompkins shall be called or charged: and have you then this writ.

Witness John W. Edmonds, presiding justice, the 26th day of February, 1851.

GEO. W. RIBLETT, Clerk.

L. S.          JONAS B PHILLIPS, Att'y.

Endorsed—Certiorari allowed, returnable on the 27th inst. before Judge Edmonds, February 26, 1851.

W. MITCHELL.

To this writ return was made by Justice Lothrop, in the words and figures following, to wit:

*City and county of New York, ss.*

Complaint having been made to the undersigned, one of the police justices for the city of New York, that a criminal offence had been committed in said city, and that the said criminal offence had been committed by Ray Tompkins; and the said Ray Tompkins having been brought before me, accompanied by his counsel, the first day of February, 1851, and from time to time thereafter, until the 24th February, 1851, I proceeded to examine under oath, Benjamin Nathan, one of the complainants, and other witnesses produced in support of said complaint, the said Ray Tompkins and his counsel being present through the whole of said examination, and the said counsel for the said Ray Tompkins fully cross-examining said witnesses, which said examination and cross-examination, are as follows:

*City and county of New York, ss.*

Benjamin Nathan, No. 77 Merchants' Exchange, sworn.— I am a broker, of No. 77 Merchants' Exchange. I am acquainted with Ray Tompkins; he was a stock and exchange broker; it was in Wall street near Broad street; I have had one business transaction with him previous to the last. I sold him on the 28th January last one hundred shares of capital stock deliverable and payable the next day; this agreement to sell was at the second board of the board of brokers, in the Mer-

The People *v.* Tompkins.

chants' Exchange, in the board of brokers' room. Previous to my transferring the stock to Mr. Tompkins on the 29th, I sent my brother, Jonathan Nathan, to Mr. Tompkins for Tompkins' check for the payment of the stock, which was three thousand three hundred and sixty-two dollars and fifty cents. This was in the neighborhood of one o'clock; the board of brokers had adjourned about half-past twelve o'clock of that day. I had not seen Mr. Tompkins on that morning before I sent for the check. My brother was gone five minutes, and returned without the check; my brother said, that Tompkins had told him that he had sent his check to the Merchants' Exchange Bank to be certified, and that he would send it to me in ten or fifteen minutes, as soon as the boy would return with the check. I then went to the office of the Farmers' Loan and Trust Company, and transferred the stock to Mr. Tompkins; I made the transfer in five or ten minutes after my brother had returned; I made the transfer in the books of the company to Ray Tompkins; I at this time owned the stock; I transferred one hundred shares to him. The reason that induced me to transfer this stock was that I was told he had sent his check to be certified, and would send it to me; I believed this representation; I went from the company's to my other business; I left the stock transferred to Tompkins, who was present at the time I transferred the stock to him; he was standing next to me; nothing passed between us at that time. He was not in the office when I went in, but came in before I made the transfer; he came in immediately after I got in the office; he was present and heard me give directions to the clerk to transfer the stock to him. When I returned to my office, I found no certified check from Mr. Tompkins. On making up my money and checks at about two o'clock, I found that no check had been received from Tompkins; I went to his office; he was not in; this was a quarter past two or half past two o'clock; I saw a young man by the name of ——— Harrison, and the clerk of Tompkins; I demanded of the clerk a check; he said Mr. Tompkins had taken my check with others to the bank to be certified, and would be back in a few minutes; I waited ten minutes and Tompkins did

not appear, and the clerk said he would go over to the bank and see if Mr. Tompkins was there, and what detained him; he left and I waited in the office; Mr. Tenbrook soon after went to the Merchants' Exchange Bank. On our way we met the clerk returning, who said Mr. Tompkins was not there. I went to the Merchants' Exchange Bank and he was not there. I returned to Tompkins' office, it being then about three o'clock; soon after the clerk opened the drawer where lay several checks, mine amongst the rest, one payable to my order signed Ray Tompkins, on the Merchants' Exchange Bank, for $3,362·50 not certified. Previous to my taking the check the clerk told me not to take the check, and he would give it to me. I took the check, but from his hand or not I can't say. I ran with the check to the bank and payment was refused for want of funds. I then went back to Tompkins' office; the clerk was there, also Minthorne Tompkins, but not Mr. Tompkins; I next saw Mr. Tompkins at the police court. I don't know the clerk's name except that they call him Archy; he was a young man; I do not know if he was or not a book keeper. I saw no other clerk than this one at Tompkins' office after two o'clock. The check has never been paid; I don't know what was done with the stock; I have not seen the books of transfer since I transferred my shares to Tompkins; I heard Mr. Tompkins give some directions to Mr. Boyd, the transfer clerk, just as I was leaving after making my transfer to him; I did not understand what it was.

*Cross-examined.*—I don't know how long Mr. Tompkins has been in the board of brokers; I have known him six months; his character in the board in regard to integrity was fair; I don't know that it was unusually high; he was in the habit of attending the board; I have heard him buy and sell in the board. I understood he lived in the country, but I don't know. I think this stock was sold to him on Tuesday: I had one hundred shares of stock for sale at a certain price: Mr. Tompkins made me an offer. I had announced publicly one hundred shares of the stock for sale, and Tompkins said I will give one quarter, and I said I will sell for half, and he said a quarter at most,

The People *v.* Tompkins.

and I said, well, I will sell you one hundred shares at that rate; he never asked me to transfer this stock; the usual time of transfer is between 12 and 2 o'clock; I received no message from Tompkins until I sent for a check; I was in my office when I sent for the check; I did not know that Mr. Tompkins was to deliver the stock to any other person, but I presumed so. The stock was not in my name, but I was the owner of it. I had bought it in the morning of Wood & Co., but had not yet had it transferred; I sold one hundred shares of other stock on this day on time. When I sent for the check, I said to my brother, go and get Mr. Tompkins' check; this was about one o'clock; he was gone five or ten minutes; my brother reported that Mr. Tompkins would send me his certified check in a few minutes. Tompkins' office was further from mine than the Stock Company's office; I did not exchange a word with Tompkins on that day; he was close to me in the stock office. I transferred one hundred shares of other stock; I understood that Tompkins was at the stock office to transfer this stock to some one else; it occupies most of the time between the meetings of the board to transfer the stock; I paid for my stock before I went to the board of brokers; I can't tell, but I think I was back to my office at 2 o'clock, where I remained a quarter of an hour before I went to Tompkins' office; I found that Tompkins' check was not sent to me at about a quarter past two o'clock; that is the usual hour of making up their accounts and deposit; it is between two and three o'clock. I had been in my office ten or fifteen minutes before I discovered his check was not in. I made no inquiry about Tompkins' check until my brother told me it was not there; the clerk, "Archy," told me, as I understood, that Tompkins said he was going to get my check certified when he went out; my impression is that "Archy," the clerk, said that Tompkins said, when he went from the office, that he was going to get his check certified for me; I understood it so. I can't say positively whether I took the check out of "Archy's" hands or from the counter; I was excited at the time; I had been excited for some time from about three o'clock or about that time; I had been very uneasy, from fifteen minutes before

The People *v.* Tompkins.

three, but I became excited at the time I found that the checks were in the drawer; "Archy" opened the drawer; the right I had to that check was, that he had my property without giving me any consideration, that is the right I claimed to the check. I have the check, here it is; I got this check after three o'clock it is not the common practice to pay checks after the bank is closed. I went from the bank to Tompkins' office, and from there to Mr. Cutting's office. I went to Mr. Tompkins' office after I left Mr. Cutting's office; I close my office after the usual office hour. After this, went to Drew & Robinson's office, and to the office of Gilbert & Johnson, and from there to the office of the chief of police, which was six or half past six o'clock. I there made a complaint before the chief, but it was not reduced to writing. I did not swear that he had absconded or was concealed; I did not swear that in substance; I did not get a warrant, but I asked to have him arrested, and I believe he was arrested. I have never presented that check to that bank since.

*Direct resumed.*—A transaction previous to this was for stock sold to Tompkins about fifteen or twenty days previous; he paid me for that stock by my sending for his check; did not obtain it, but he afterwards sent me a certified check upon the Merchants' Exchange Bank. I transferred the stock before I received the check.

BENJ. NATHAN.

Sworn before me this February 1st, 1851.

J. LOTHROP, Police Justice.

Accompanying this affidavit, were the affidavits of Jonathan Nathan, Herman Johnson, William O'Kell, Le Grand Lockwood, Wm. W. Gilbert, John P. Duffy, William M. Clark, John Thompson, Edward H. Arthur, Robert C. Boyd and others.

The hearing upon the above writs of habeas corpus and certiorari was postponed from time to time, and decided on the 11th of April, 1851, after argument of counsel.

*N. Bowditch Blunt* (district attorney), and
*W. C. Noyes,* for the people.

*Ogden Hoffman*, and
*John Van Buren*, for Ray Tompkins.

Edmonds, J. — It was very strenuously urged on the argument of this case, on the part of the public prosecutor, that on *habeas corpus* the court or officer had no right to go behind the warrant on which the prisoner was detained, and inquire from facts out of the return into the legality of the imprisonment.

The effect of this principle would be, that the warrant of a committing magistrate, when legal upon its face, would be conclusive upon the prisoner, and he could have no relief from imprisonment, even if no charge whatever had in fact been preferred against him.

The proposition was of so grave a character, and was fraught with consequences so palpably mischievous, and was withal asserted with so much zeal, and apparently with the support of authorities, that I have examined the subject very carefully, and rejoice to find that there is no authority to shake my previous convictions on this subject.

The most prominent authority cited in support of the proposition is note 30 to the appendix, in 3 *Hill*, 659 — where it is broadly laid down, that under our act of 1818, and under sec. 50 of our present *habeas corpus* law (2 *R. S.* 471) — if the object be to impeach the warrant as irregular, or as founded on an irregular or erroneous judgment, decree or conviction, you can no more inquire of such things collaterally by *habeas corpus* than by action or indictment, and that our statute was not intended as an authority to inquire into the validity of writs, warrants or other process, further than to ascertain whether they will protect the party suing them out, or the officer serving or executing them.

So far as this relates to " judgments, decrees and convictions," it is unquestionably correct, for they can not be inquired into collaterally; but so far as it relates to writs, warrants or other process, before final judgment, it is far from being correct, and it is unsupported by any authority, except a dissenting

opinion of one of the judges in the matter of Prime, &c. (1 *Barb. Sup. Co. Rep.* 349.)

Three cases are cited in the note in question in support of the proposition in its broadest form. The first is the case of the sheriff of Middlesex. (11 *Ad. & Ellis,* 273.) In that case the court held, that it did not come under the 56 Geo. III, which is our statute, under which the proceeding is now before me, and the main question decided was, whether a process of contempt was good which omitted to state the particulars of the contempt.

The position which it is cited to support was not raised in the case at all, nor indeed could it be, for the process was final in execution of a final judgment of contempt. The next case is, *The People* v. *Nivens.* (1 *Hill,* 154.) That, also, was final process of contempt, and the question now before me was not raised, nor even alluded to in the whole case.

The matter of Clark (9 *Wend.* 212), is the remaining one cited in the note. That was an extradition case of a fugitive from justice, under the constitution of the United States, and the court held, that the question before it was, under the constitution, not one of guilt or innocence of the accused, but whether he was properly charged, so as to warrant the governor in surrendering him.

It will be very readily perceived, that none of these cases support the principle contended for.

The district attorney, however, cited other cases in support of his proposition. Among them, *Bermac* v. *The People.* (4 *Barb.* 31.) That again was a case of final process, in execution of a summary conviction, and the counsel for the prisoner did not traverse the return, so that at first blush it is manifest that it does not touch the question before me.

Another case is, *The People* v. *Cassels* (5 *Hill,* 168), which was also a commitment for contempt, and the court held that the prisoner had an undoubted right to show that the committing magistrate acted without authority, and that this was so, notwithstanding the commitment recited the existence of the necessary facts to give jurisdiction. And they add, what is

The People *v.* Tompkins.

alike good sense and good law, no court or officer can acquire jurisdiction by the mere assertion of it, or by falsely alleging the existence of facts on which jurisdiction depends.

The case of *McLeod* (1 *Hill*, 377), is the only remaining one cited for the prosecution. There the question was, whether the court on *habeas corpus* would go behind an *indictment* to examine the question of guilt or innocence; and the court in refusing to do so, expressly admit the propriety, in case of a commitment on a coroner's inquest, to look into the depositions and say, that it was not necessary to inquire how far they might go were the prisoner in custody on the mere examination or warrant of a committing magistrate.

These are all the cases which I can find, or to which I have been referred in support of the doctrine contended for in behalf of the prosecution. They do none of them sustain the doctrine, and it is well they do not, for the *habeas corpus* would be a mockery, whenever a magistrate might please to make the instrument of oppression and false imprisonment formal and regular on its face, and personal liberty would be at the mercy of ignorance or design, beyond anything yet known to our laws, careless as they too frequently are of freedom in the detail, from the abundance of it in the gross.

I have always understood that it was the intention to give to a party committed for a crime by an examining magistrate, an appeal from his commitment to the higher judges, by virtue of the writ of *habeas corpus*, and such has uniformly been my practice.

The practice is abundantly sanctioned by authority and statute.

Thus, in the very notes in 3 *Hill*, which are so much relied upon, it is laid down that on a commitment by final process upon a summary conviction, the record of conviction may be examined, and if it be void, the prisoner will be discharged. (*Note* 38, *p*. 665.) So, where the arrest was without the territorial jurisdiction of the court; so, where the prisoner was carried before a remote justice, when there was one nearer before whom he ought to have been carried. (*Ib. note* 39.) So,

where in a criminal case the warrant is void, the original depositions will be looked into to see whether an offence has been committed, so that the prisoner may be remanded, or held to bail. (*Ib. note* 40). In case the commitment be for felony, the prisoner may, if brought up before the indictment, insist that the depositions be looked into as a part of the documentary authority on which the commitment was founded. For this purpose, copies may be brought up by *certiorari*. (*Ib. note* 43.) And in *Note* 45 it is said, the accused who appeals by *habeas corpus*, must, at his peril, show that he has been committed on insufficient evidence, and where the charge appears to be wholly groundless and without suspicion, the prisoner may be discharged.

For this the writer cites 1 *Chitty Cr. Law* 128, where it is said, that if the court ascertain that there is no pretence for imputing to the prisoner any indictable offence, they will discharge him; and *Bultman and Swartwout's case* (4 *Cranch*, 125), where the United States Supreme Court, chief justice Marshall delivering the opinion, quotes this passage from Chitty as that of a very learned and accurate commentator, and where the prisoners were discharged on *habeas corpus*.

In *ex parte Tayloe* (5 *Cowen*, 51), the supreme court say, that in all cases on *habeas corpus* previous to indictment, the court will look into the depositions before the magistrate, or before the coroner's inquest, and though the commitment be full, and in due form, yet if the testimony proves no crime, the court will discharge or bail.

In the matter of Prime (1 *Barb.*, 349), the court looked beyond the warrants, and into the affidavits, to see that the judge had colorable jurisdiction.

In *ex parte Watkins* (3 *Peters*, 202), Ch. J. Marshall described the writ of *habeas corpus* as in the nature of a writ of error, which brings up the body of the prisoner with the cause of commitment, and he adds — the court can undoubtedly inquire into the sufficiency of that cause; and Chancellor Kent, in his commentaries, (*vol. 2 pp.* 28, 31,) says that the act of 1818, which is now incorporated into the revised statutes,

The People *v.* Tompkins.

gave to the officer before whom the writ of *habeas corpus* was returned, authority to revise the cause of commitment and to examine into the truth of the facts alleged in the return, and the officer may examine into the merits of the commitment, and hear the allegations and proofs arising thereon in a summary way, and dispose of the party as justice may require.

The language of the statute is equally explicit —

Section 38 enacts, that the court or officer before whom the party shall be brought on such writ of *habeas corpus,* shall immediately after the return thereof, proceed to examine into the facts contained in such return, *and into the cause of confinement or restraint of such party,* whether the same shall have been upon commitment for any criminal or supposed criminal matter or not.

Section 43 enacts, If it appear that the party has been legally committed for any criminal offence, *or if he appear by the testimony offered with the return, or upon the hearing thereof,* to be guilty, &c., he shall be remanded, and by section 48, it is enacted, that the prisoner may deny the facts in the return, or allege any fact to show his imprisonment unlawful, and thereupon the officer shall proceed to hear the proofs and allegations produced on either side, and dispose of the party as the justice of the case may require.

It is under this array of authority, settling thus clearly at once my authority and my duty, that I approach the main question involved in these proceedings.

And here two things are apparent: 1. That the act imputed to the defendant is not a crime; and 2, that it is not proved.

The offence charged is, that on the 29th day of January, 1851, Ray Tompkins did designedly, and by means of false pretences, cheat and defraud Benjamin Nathan out of one hundred shares of the stock of the Farmers' Loan and Trust Co., of the value of $3,000, and more.

From the depositions, it appears that, on the 28th of January, Nathan agreed to sell to Tompkins one hundred shares of that Co., deliverable and payable the next day. On the next day, before transferring the stock, Nathan sent for a check, and

received for answer that Tompkins had sent his check to be certified, and would send it to Nathan in ten or fifteen minutes, and relying upon this promise, Nathan thereupon transferred the stock to Tompkins. Tompkins never asked to have it transferred to him; but the usual time for transferring having arrived, Nathan, without any request from Tompkins, transferred it. A previous transaction between these parties had been conducted in the same manner. Nathan having transferred the stock on that occasion and afterwards received Tompkins' certified check.

Upon this state of things, it is perfectly apparent that Nathan's reliance was upon the promise, that a check would be sent in ten or fifteen minutes, and not solely on the fact that Tompkins had sent his check to be certified. And nothing can be better settled than the rule, that such a promise is not a false pretense under the statute.

To constitute the crime under the statute, two things are essential: a false representation as to an existing fact, and a reliance upon that representation as true. Both these ingredients are wanting in this case; for the reliance evidently was mainly on the promise to send the check. This in no respect constitutes the crime.

The only representation of an existing fact that there is to be found in the case, is that in respect to Tompkins having sent his check to be certified  His having done so would be of no possible value to Nathan, unless it had been followed up by being sent to Nathan, and it is apparent that Nathan's reliance was upon Tompkins' credit and his promise to send him the check, and not upon the fact that he had sent it to be certified — a fact which alone could be of no value to Nathan, and upon which alone, or even chiefly, it is manifest that Nathan did not rely.

The best test is to suppose the case should go on to trial. The question to be submitted would be, whether Nathan transferred the stock, relying solely on the representation, that Tompkins had sent his check to be certified, necessarily excluding all idea of Tompkins' responsibility, for there was no

The People *v.* Tompkins.

representation as to that excluding the promise to send him the check, for that is no element of the crime, and excluding the idea that the check would be certified when sent for that purpose, for there was no representation that it would be.

It is idle to suppose that a conviction would be warranted, or be allowed upon such a state of things.

The fact that in his cross-examination, Nathan conveys the idea, that his reliance was upon Tompkins' promise that he would send his certified check in a few minutes, — the fact that the stock was voluntarily transferred on the 29th, pursuant to a previous contract of sale, and without Tompkins ever having requested it to be transferred, and the fact that it was in Tompkins presence that Nathan transferred the stock, and without a word passing between them, would be entirely controlling on the subject.

But even if it were otherwise, even if it could be found that Nathan's reliance had been upon the representation that Tompkins had sent his check to be certified, there is no evidence that such was an untrue allegation. It appears that the check was made out, but it nowhere appears that it had not been sent to be certified. And the falsity of the pretence is not established, nor even attempted to be. And for aught that appears, it may be perfectly true that Tompkins had sent the check to be certified; and if it may, then there is no foundation whatever for the criminal charge on which the defendant is arrested.

I have thus far confined my attention to the charge against the defendant named in the warrant; and though I do not find in the depositions sufficient evidence to support that charge, it is still my duty, under the statute, to inquire whether the depositions show him guilty of any criminal offence.

The examinations before the magistrate took a very wide range, inquiring into all the transactions of the defendant on the day of his failure, and on the argument considerations were urged in reference to the moral propriety of his conduct on that occasion. With the latter topic I have nothing to do. I am not authorized to inquire whether his conduct squared with strict morals, or a high standard of commercial honor    I am

The People *v.* Tompkins.

to inquire merely whether a legal crime had been committed, and whether there is probable cause to suspect the defendant to have been guilty of it. None of the counsel for the prosecution suggested that the depositions showed the commission of any other crime, than that of obtaining the stock from Nathan by false pretences. Nor upon looking into the depositions do I find any other charged. The defendant's failure seems to have come upon him suddenly and unexpectedly. His transactions on the day of his failure do not seem to have been out of the ordinary course of his business, nor upon a larger scale than usual. All the money he received on that day, as well as several thousand dollars of a balance remaining in bank, except $25, he appropriated to the payment of debts, which seem to have been justly owing by him, and which, at all events, are not in these proceedings impeached. In such appropriations, he preferred some debts over others. Whether it was lawful or proper for him to make such preferences, is not a question now before me. All that I have to do is to ascertain whether it was legally criminal for him to do so. It certainly was not; and as that is the only offence imputed to the defendant, besides that growing out of the transaction with Nathan, there is no legal warrant for holding him in custody, and he must be discharged; and he is accordingly discharged